## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

---

Tybetha Will Prosper, as Trustee for the
next of kin of Naajikhan Adonis Powell,
Deceased,

        Plaintiff,

vs.

Inny Angrimson, in her individual capacity,
Kilhlah Leuzzo, in her individual capacity,
Erin Cottom, in her individual capacity,
Scott Johnson, in his individual capacity,
Anthony Hamling, in his individual capacity,
Hennepin Healthcare System, Inc., and
County of Hennepin, Minnesota,

        Defendants.

Case No. 21-cv-00627 (SRN/TNL)

**First Amended Complaint**

**Jury Trial Demanded**

---

For her First Amended Complaint pursuant to Fed. R. Civ. P. 15(a)(1)(B), Plaintiff

Tybetha Will Prosper ("Plaintiff"), as trustee for the next of kin of decedent Naajikhan

Adonis Powell ("Powell"), by and through her attorneys, states and alleges as follows:

### Introduction

1.      More detainees have died since 2015 at the Hennepin County Jail than at

any other detention center in Minnesota over the same span of time.  Hennepin County

and Hennepin Healthcare employees repeatedly fail to properly identify Jail inmates as

high risk for suicide and fail to properly monitor detainees in their care.  The County has

a longstanding custom of failing to conduct well-being checks and lying about it without

repercussion.  Due to these and other organizational and individual failures described

herein, Powell tragically committed suicide at the jail, dying way before his time.  The

Defendants in this case must be held accountable for Powell's death, and the County and

Hennepin Healthcare must be forced to do better because they have not done so on their

own accord.

2.      This is an action for money damages brought pursuant to 42 U.S.C. § 1983

for the wrongful death of Powell, as the direct and proximate result of the deliberate

indifference to Powell's serious medical needs and negligence of Defendants, as set forth

herein.

### **Parties**

3.      At all times material hereto and until the time of his death on September 17,

2020, Powell was a 23-year-old man residing in Minneapolis and a citizen of the United

States.

4.      Plaintiff is Powell's mother and she resides in Hennepin County,

Minnesota.  On October 7, 2020, Plaintiff was appointed as trustee for Powell's next of

kin.  A true and correct copy of the Order appointing Plaintiff as trustee is attached to the

initial Complaint as Exhibit A.

5.      Plaintiff's surviving next of kin include his parents, grandparents, and

siblings.

6.      Plaintiff brings this action on behalf of Powell's next of kin.

7.      Defendant County of Hennepin, Minnesota a/k/a Hennepin County (the

"County") is a county within and a political subdivision of the State of Minnesota.  It is a

body politic and corporate subject to suit pursuant to Minn. Stat. § 373.01 *et seq.*  The

County is also defined as a municipality for purposes of tort liability pursuant to Minn. Stat. § 466.01 *et seq.* Hennepin County owns and operates the Hennepin County Sheriff's Office ("HCSO"), the Hennepin County Adult Detention Center a/k/a Hennepin County ADC a/k/a the Hennepin County Jail (hereafter, the "Jail"), and Hennepin Healthcare System, Inc.

8.   Hennepin Healthcare System, Inc. is a Minnesota public subsidiary corporation authorized by statute, Minn. Stat. § 383B.901 *et seq.*, and located in Hennepin County, Minnesota. It does business as Hennepin Healthcare and Hennepin County Medical Center ("HCMC"). Hennepin Healthcare System, Inc. shall hereafter be referred to as "Hennepin Healthcare."

9.   All acts and omissions of HCMC staff herein are the acts and omissions of Hennepin Healthcare. In turn, all acts and omissions of Hennepin Healthcare are considered to be the acts and omissions of the County.

10.   Hennepin Healthcare employs medical personnel and provides the services of those personnel to the Jail for the purposes of providing medical care to the Jail detainees.

11.   Employees of the County and Hennepin Healthcare both work under color of state law for purposes of 42 U.S.C. § 1983.

12.     Hennepin Healthcare and the County, to the extent considered distinguishable entities, engaged in a joint venture and worked in concert with one another to provide medical care to the inmates and detainees[1] at the Jail.

13.     At all times material hereto, the County owed Powell and other inmates at the Jail a nondelegable duty of care to ensure that they received legally sufficient medical care.

14.     Upon information and belief and at all times material hereto, Nurse Inny Angrimson ("Nurse Angrimson") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law.  She is sued in her individual capacity.

15.     Upon information and belief and at all times material hereto, Nurse Kilhlah Leuzzo ("Nurse Leuzzo") resided in Minnesota, was employed by Hennepin Healthcare, and acted under color of state law.  She is sued in her individual capacity.

16.     Upon information and belief and at all times material hereto, Deputy Erin Cottom was a deputy in the HCSO, employed by the County, and acted under color of state law.  She is sued in her individual capacity.

17.     Upon information and belief and at all times material hereto, Deputy Scott Johnson was a deputy in the HCSO, employed by the County, and acted under color of state law.  He is sued in his individual capacity.

---

[1] The terms "inmate" and "detainee" shall be used interchangeably and without distinction for purposes of this Complaint.

18.     Upon information and belief and at all times material hereto, Deputy Anthony Hamling was a deputy in the HCSO, employed by the County, and acted under color of state law.  He is sued in his individual capacity.

<u>**Jurisdiction and Venue**</u>

19.     Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983 and 1988, the Eighth and Fourteenth Amendments to the United States Constitution, and 28 U.S.C. §§ 1331 and 1343(3).  The aforementioned statutory and constitutional provisions confer original jurisdiction over this action.  This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

20.     Venue is proper in this Court under 28 U.S.C. §1391(b) because all incidents, events, and occurrences giving rise to this action occurred in the District of Minnesota. Moreover, upon information and belief, all of the parties reside in this Judicial District.

<u>**Background**</u>

**A.     The County's history of deliberate indifference at the Jail**

21.     At all times material hereto and for over a decade, the Jail has required in accordance with state law and internal policy that—at a minimum—County custodial staff conduct a well-being check of each inmate every 30 minutes.  These checks are required to be staggered.  *See* Minn. R. 2911.5000, subp. 5 (2013) (previously at subpart 2); *see also* Jail Policy 8-1600 *et seq.*

22.     Jail Policy 8-1602A requires more frequent observation for high-risk inmates: "Each inmate shall have a well-being check conducted on them at least every

5

thirty minutes.  The well-being checks shall be staggered.  More frequent observation shall be conducted for high risk inmates.  Examples of high risk inmates include those determined to be **potentially** suicidal, **mentally ill**, experiencing withdrawal from drugs or alcohol, violent, or **who exhibit unusual or bizarre behavior**.  (4-ALDF-2A-05 4-ALDF-2A-52; 2911 5000subp.5) (emphasis added).

23.     Staggered well-being checks are a vital and effective means of both detecting and deterring inmate suicide attempts.

24.     Well-being checks must be completed slowly and deliberately enough to confirm that the inmate is alive and well, not just that there is a human body in the cell.

25.     Staff conducting well-being checks must observe signs of life such as movement or the rise-and-fall of one's chest (indicative of breathing).

26.     On and prior to September 11, 2020, it was well known to the County, Hennepin Healthcare, and the correctional and medical staff working at the Jail and HCMC that suicide was the leading cause of death at all jails nationwide.

27.     On and prior to September 11, 2020, it was well known to the County, Hennepin Healthcare, and the correctional and medical staff working at the Jail and HCMC that there had been a significant increase in inmate suicide at the Jail.

28.     Upon information and belief, there have been at least 10 in-custody deaths of inmates at either the Jail or other County correctional facilities since 2015, and many, if not most, of those deaths were suicides.  Even when not a suicide, the County's failures with respect to well-being checks were a moving force behind those deaths.

29.     The County has failed to conduct proper welfare checks at the Jail despite repeated notice.

30.     In biannual inspection reports conducted by the Minnesota Department of Corrections ("DOC") in both 2016 and 2018, the DOC facility inspector found that the County's well-being checks were out of compliance with Rule 2911.5000, subpart 5.

31.     In 2016, Senior Detention Facility Inspector Greg Croucher ("Croucher") found that "[t]he documentation of health and welfare checks is inconsistent. Additionally, the majority of checks are done through the pipe chases and not in the housing units."

32.     In 2018, Croucher similarly found that: "The majority of checks are done through the pipe chases and not in the housing units.  Due to incidents that occurred during this inspection cycle, this standard was found to be out of compliance.  Staff members were not always completing health and welfare checks appropriately. Some housing units were entered but staff did not walk around the unit fully.  Facility Administration is aware of this issue and has taken steps to address it."

33.     Upon information and belief, in June 2017 Robert Kellemeier hung himself at the Jail and died from suicide.  The DOC found that well-being checks were not properly conducted on Kellemeier.  The lack of proper well-being checks on Kellemeier caused, at least in part, Kellemeier's death.

34.     In conducting a DOC review of Kellemeier's death, Croucher found that "[t]he majority of the health and welfare checks observed were not completed appropriately. The correctional officer doesn't look into each cell and at times is looking

down at the floor, doesn't turn his head at all towards the cells or goes around the dayroom tables. Consequently, most of the health and welfare checks leading up to the discovery of Mr. Kellermeier [redacted] are out of compliance with both facility policy and the Chapter 2911 standards. Additionally, the correctional officer is observed at a pace that is too fast. Signs of life such as: movement, rise and fall of chest or other signs of life would be difficult to determine at such a quick pace."

35.     Upon information and belief, in July 2017 Bearheart Buehlmann was found dead in his cell at the Hennepin County Workhouse.  The DOC found that well-being checks were not properly conducted on Buehlmann.  The lack of proper well-being checks on Buehlmann caused, at least in part, Buehlmann's death.

36.     Upon information and belief, in January 2018 Kristina Duren died from a drug overdose.  The DOC found that well-being checks were not properly conducted on Duren.  The lack of proper well-being checks on Duren caused, at least in part, Duren's death.

37.     Upon information and belief, in August 2018 Miguel Angel Garcia hung himself at the Jail and died from suicide.  The DOC found that well-being checks were either done late or not at all, and that Jail staff were logging checks that did not occur. The lack of proper well-being checks on Garcia caused, at least in part, Garcia's death.

38.     Upon information and belief, in September 2018 Tristan Keys hung himself at the Jail and died from suicide.  The DOC found that wellbeing checks were either done late or not at all, and that Jail staff were logging checks that did not occur.  The lack of proper well-being checks on Keys caused, at least in part, Keys' death.

8

39.     As discussed in detail below, Powell committed suicide as a result of hanging himself at the Jail on September 11, 2020.  Despite Powell's September 11 suicide only twelve days prior, the biannual DOC inspection conducted on September 23, 2020 **still reflected** a failure of Jail staff to conduct proper well-being checks.

40.     In the 2020 report, Senior Detention Facility Inspector Sarah Johnson ("Johnson") found a violation of Rule 2911.0300 for the County's failure to correct deficiencies, writing that "[t]his is written notice of a level one sanction to Hennepin County Adult Detention Center.  Due to well-being checks being out of compliance for two inspection cycles, the Department of Corrections is issuing written compliance orders for rule standard 2911.5000 Subpart 5 Well-being."

41.     Johnson further found that "[t]here were multiple areas of concern for well-being checks.  Logs show well-being checks are being completed exactly every 30 minutes apart and not staggered as required.  Video review verified staff members were not always completing well-being checks appropriately.  When staff were completing well-being checks in units E and F, they were not always going into the linear day spaces to personally observe inmates, they are observing them from the door.  A proper well-being check cannot be done standing at the doorway of units.  It was observed that during sleeping hours some staff completed well-being checks at a pace too fast to confirm signs of life.  I was unable to verify proper well-being checks during the sleeping hours for the City Hall building due to poor camera quality.  This issue should be rectified with the new camera system that is planned in 2021."

42.     Johnson ordered the following corrective action: "[t]he Officials of Hennepin County ADC will need to submit corrective action to the Department of Corrections to ensure checks are being completed appropriately. This is a repeat concern for this facility. Staff need to stagger their time and to enter the units fully to properly view inmates. Staff members need to slow down and be more deliberate at each cell to ensure the well-being of each inmate…"

**B.     Powell had an extensive history of objectively serious medical and mental health needs, which Hennepin Healthcare staff had knowledge of but repeatedly ignored.**

43.     In his late-teens, Powell developed serious mental illness, for which he received both voluntary and involuntary treatment.

44.     On January 13, 2020, Powell was committed as mentally ill to the head of the North Memorial Medical Center and to the Commissioner of Human Services.

45.     On January 16, 2020, Powell was charged in Hennepin County District Court with possession of a dangerous weapon for carrying brass knuckles into a courthouse on January 8, 2020.

46.     On May 26, 2020, Powell was provisionally discharged from Abbott Northwestern Hospital ("Abbott").

47.     Following his discharge, Powell began residing at Gabby Care Homes ("Gabby"), a group home in Champlin, Minnesota.

48.     On July 16, 2020, Powell was admitted into Hennepin County's Mental Health Criminal Court.

10

49.     On July 17, 2020 Powell was brought from Gabby to HCMC's emergency room by ambulance after he called 911 reporting increased anxiety and depression, and was admitted to HCMC's Psychiatric Unit, where he remained until August 5, 2020.

50.     On July 19, 2020, Powell told his probation officer, James Burnett, that he needed to be in a mental hospital and needed a higher-level of care than a treatment program can offer.

51.     Powell was discharged back to Gabby from HCMC on August 5, 2020.

52.     Powell was then discharged to Park Ave. Center Chemical Dependency treatment on August 10, 2020.

53.     On August 11, 2020, Powell called 911 and reported suicidal ideation. He was transported to HCMC where his diagnosis was "Suicidal Ideations."  He told HCMC staff that he planned to "hang myself or something."  He attempted to hang himself earlier in the week and reported feeling "increasingly suicidal."

54.     Powell reported to HCMC staff that "[h]e did have an attempt about a week ago where he had the rope around his neck and jumped but decided he did not want to die and was able to get out of it."

55.     By August 2020, Powell's diagnoses from and/or documented at HCMC included but were not limited to schizophrenia, severe anxiety, PTSD, major depression, bipolar disorder, with a history of substance abuse, suicidal behavior, suicidal ideation, and suicide attempts.

56.     HCMC staff also documented on August 12, 2020 that Powell's group home manager at Gabby informed HCMC staff that Powell "has been saying he is suicidal all week and has been seen in several hospital[s] this week."

57.     Also on August 12, Powell's County case worker reported to HCMC staff that "Powell told [the caseworker] that he was suicidal yesterday [August 11], wanting to set himself on fire with gasoline that he had bought earlier in the week or hang himself."

58.     In short, Powell told anyone who would listen that he was going to hang himself, and it was well documented by Hennepin Healthcare staff at HCMC in Powell's medical records.  Still Hennepin Healthcare attempted to minimize Powell's risk of self-harm by labeling him "chronically suicidal," and discharged him.

59.     Powell returned to HCMC the very next day on August 13, 2020, because of suicidal ideation, reporting that he planned to hang himself.

60.     Gabby discharged Powell and reported that he had become non-compliant with his medications.

61.     On August 14, 2020, the court issued an Order to Appear regarding the January 2020 weapons charges.  The basis was that Powell was non-compliant with his medications and failed to complete court-ordered treatment.

62.     Over the weekend of August 15, 2020, Powell was repeatedly banging his head against a wall at HCMC.

63.     On August 17, 2020, Powell's case manager requested an "ex parte order for emergency return to facility" for Powell. He asked the Court to revoke Powell's provisional discharge and return him to the commitment facility because Powell reported

that he did not feel safe and that he planned to hang himself. Powell's caseworker concluded that "[t]here is a serious likelihood that [Powell's] safety or that of others will be jeopardized if [Powell's] provisional discharge is not revoked and is not returned immediately to the head of Abbott Northwestern Hospital."

64.     Hennepin County District Court Judge Carruthers entered the *Ex Parte Order for Emergency Return to Facility* on August 17, 2020.  In that order, Judge Carruthers required that Powell be held at HCMC until beds became available at Abbott, at which time Powell was to be transferred back to Abbott.

65.     Despite Judge Carruthers' Order, Hennepin Healthcare staff, including Christina Frazel, M.D. ("Dr. Frazel"), provisionally discharged Powell from HCMC back to Gabby on September 1, 2020.

66.     Powell was transported back to HCMC on September 3, 2020 due to another psychotic episode at Gabby.  HCMC staff recorded that Powell had been having auditory and visual hallucinations since he return to Gabby.  HCMC staff also concluded that Powell was acutely psychotic and attempted sedation with olanzapine.

67.     Despite Powell's acutely psychotic episode, documented history of suicidality and other safety risks, and Judge Carruther's August 17, 2020 Order, HCMC intended to discharge Powell **back to street** on September 3, 2020, since Gabby indicated that Powell was not suitable for return to a group home environment.

68.     Powell, who repeatedly told HCMC staff he was not safe to discharge, had an increased psychotic episode when he was informed that HCMC was discharging him.

69.     Only then was Powell re-evaluated by different staff, and it was concluded that it was not safe for Powell to be discharged.

70.     Powell then remained in HCMC's inpatient psychiatry unit for the next week.

**C.     Hennepin Healthcare and the County jointly planned for Powell's removal from HCMC to the Jail, and the Jail staff observed upon Powell's arrival that Hennepin Healthcare staff designated Powell as a moderate suicide risk.**

71.     On September 10, 2020, HCMC nurse and psychiatric program advocacy specialist Zachary Lenshek ("Nurse Lenshek"), sent a text message to HCSO Deputy Jason Lee Miller ("Dep. J. Miller"), who serves as a transport coordinator for the HCSO.

72.     Dep. Miller's duties include arranging for the transportation of individuals from HCMC to the Jail, which is not an unusual occurrence.

73.     Nurse Lenshek informed Dep. J. Miller that Powell had an outstanding warrant, and that the psychiatric team would like Powell transferred to the Jail on September 11, 2020.

74.     Nurse Lenshek informed Dep. J. Miller that Powell was a patient in B2ICU, which was known to Dep. Miller as being a locked mental health unit.

75.     It was documented in Powell's HCMC medical records that no Hennepin Healthcare staff intended to inform Powell of his pending seizure by the HCSO. Hennepin Healthcare intended for Powell to be taken by HCSO deputies by surprise to avoid an unwanted reaction by Powell.  Powell was known by Hennepin Healthcare to

14

exhibit the effects of his mental illness upon being seized and placed into a custodial setting.

76.     Dep. J. Miller then arranged for HCSO Deputies Clinton Sutton ("Dep. Sutton") and Cindy Miller ("Dep. C. Miller") to seize and transport Powell from HCMC to the Jail.

77.     Dep. Sutton entered B2ICU shortly before noon on September 11.

78.     He approached Powell, who was wearing a hospital gown, separated him from other patients, and placed Powell in handcuffs.

79.     At or around this time, Dep. Sutton was provided a manilla envelope containing, upon information and belief, discharge papers and other medical records for Powell.

80.     Dep. Sutton was instructed by HCMC staff that the paperwork was for the Jail nurses.

81.     The precise contents of the documents contained in the manilla envelope are unknown to Plaintiff; however, at least one document contained in the envelope identified Powell as a "moderate" suicide risk.

82.     Dep. Sutton and Dep. C. Miller then transported Powell to the Jail.

83.     During the transport, Powell appeared visibly confused.

84.     Dep. C. Miller characterized Powell's state as "so-so."

85.     Powell asked Dep. C. Miller if whether he would be permitted to return to the hospital after jail, and she advised that it would be up to the judge.

15

86.     Upon their arrival with Powell, the deputies were met by a large number of HCSO personnel in the sally port and intake area.

87.     Much of the interaction in the sally port and intake area is captured on video.

88.     Upon information and belief, Powell and the deputies were met by a large number of HCSO personnel in the sally port because the HCSO was informed in advance that Powell was mentally ill and could be uncooperative.

89.     These staff included intake coordinator and detention Deputy C. Lange ("Dep. Lange"), detention Sgt. Charles Hubbard ("Sgt. Hubbard"), Deputy Chelsea Smith ("Dep. Smith"), and Deputy Erin Cottom ("Dep. Cottom").

90.     Dep. Sutton advised Dep. Smith that the documents in the manila envelope were intended for the Jail nursing staff.

91.     Dep. Sutton also advised to staff on the scene that Powell was at the Jail due to erratic behavior.

92.     Dep. Smith reviewed the documentation contained in the manila envelope and remarked that Powell's records identified him as a moderate suicide risk.

93.     Dep. Smith did not know what a moderate suicide risk was.

94.     Dep. Smith remarked that the Jail used to have three designations for suicidality (low/medium/high), but on September 11 only designated inmates as on suicide precautions or not on suicide precautions.

95.     Dep. Sutton and Smith agreed that the Jail nursing staff should be called, and Powell was escorted from the sally port into the intake area.

**D.     Jail Nurses Angrimson and Leuzzo ignore Powell's serious medical needs.**

96.     Nurse Angrimson responded to the call from the HCSO detention deputies and arrived shortly thereafter in the intake area.

97.     Nurse Angrimson learned upon her arrival that Powell had just arrived from the HCMC psychiatric unit and observed that Powell was in a hospital gown.

98.     Nurse Angrimson also reviewed Powell's paperwork in the intake area and observed that the paperwork from HCMC identified Powell as a moderate suicide risk.

99.     Nurse Angrimson did not know what a moderate suicide risk meant in relation to the Jail's standards for assessing suicide risk.

100.    In completing his intake paperwork, Powell identified in intake paperwork that he hears voices.

101.    Nurse Angrimson continued her intake of Powell shortly after 2:00 p.m.

102.    Video evidence reveals that Powell was erratically rocking and bouncing in his chair while meeting with Nurse Angrimson, objectively indicative of an individual presenting with serious mental health concerns.  Yet, Nurse Angrimson made no notation of this behavior.

103.    Nurse Angrimson, as a Hennepin Healthcare nurse, had the ability to and did access Powell's Hennepin Healthcare records from HCMC.  From those records, Nurse Angrimson observed that Powell had a serious mental health history, including a history of suicidality, and that Powell had been prescribed a host of medications indicative of an individual with serious medical needs.

17

104.    Powell's medications included Cogentin, Zyprexa, Inderal, and Risperdal Consta.

105.    Upon information and belief, Nurse Angrimson knew that at or about the same time Powell was being admitted into the Jail, the County was seeking a recommitment and *Jarvis* Order for Powell.  A *Jarvis* hearing is required when a mentally ill person refuses neuroleptic (anti-psychotic) medications.  Thus, not only did she know that Powell had serious mental health needs and was a moderate risk of suicide, Nurse Angrimson understood that Powell was not presently compliant with his medications.

106.    Nurse Angrimson, after reviewing Powell's Hennepin Healthcare records, still did not understand what HCMC's denotation of Powell as a moderate suicide risk meant.  Yet, Nurse Angrimson made no effort to contact Hennepin Healthcare staff at HCMC to gather information on the denotation or Powell's risk of suicide.

107.    Despite all of the information in her possession suggesting Powell was at risk for suicide, and Powell's concerning behavior in front of her, Nurse Angrimson arbitrarily rated Powell a "2" under the Jail's suicide acuity rating system.  This resulted in Nurse Angrimson clearing Powell for placement in general population, subject to only to standard 30-minute well-being checks, rather than requiring closer monitoring.

108.    Nurse Angrimson conferred with Nurse Leuzzo, who was working at the same time as Nurse Angrimson.

109.    Nurse Angrimson conveyed to Nurse Leuzzo that: (1) Powell had just been transferred from HCMC's psychiatric unit; (2) HCMC identified Powell as a moderate

suicide risk; and (3) Powell had a history of civil commitment and non-compliance with medication.

110.    Upon information and belief, Nurse Leuzzo knew that at or about the same time Powell was being admitted into the Jail, the County was seeking a recommitment and *Jarvis* Order for Powell.  Thus, not only did she know that Powell had serious mental health needs and was a moderate risk of suicide, Nurse Leuzzo understood that Powell was not presently compliant with his medications.

111.    Like Nurse Angrimson, Nurse Leuzzo did not understand what HCMC's denotation of Powell as a moderate suicide risk meant.  Yet, Nurse Leuzzo also made no effort to contact Hennepin Healthcare staff at HCMC to gather information on the denotation or Powell's risk of suicide.

112.    Nurse Leuzzo, as a Hennepin Healthcare nurse, also had the ability to and did access Powell's Hennepin Healthcare records from HCMC.  From those records, Nurse Leuzzo also observed that Powell had a serious mental health history, including a history of suicidality, and that Powell had been prescribed a host of medications indicative of an individual with serious medical needs.

113.    Nurse Leuzzo has provided conflicting information regarding Powell's acuity score.  Plaintiff alleges that the sum of her statement to the investigator was that Powell should have been scored a "3" rather than a "2" under the jail's suicide acuity rating system, but Nurses Leuzzo and Angrimson forgot to change Powell's score after their joint consultation with one another.

114.    Had Nurses Leuzzo and Angrimson scored Powell a "3," he would not have been housed in general population subject to only the standard 30-minute well-being checks.

**E.      Hennepin Healthcare and the County jointly planned for Powell to be Recommitted and subject to a *Jarvis* Order.**

115.    On September 11, 2020 at 3:22 pm, the County filed a Petition for Judicial Recommitment, once again seeking to commit Powell to Abbott Northwestern and the Commissioner of Human Services.

116.    In support of recommitment, the County submitted an examiner's statement from Christina Frazel, M.D. ("Dr. Frazel"), one of Powell's treating doctors at HCMC.

117.    Upon information and belief, Dr. Frazel drafted the examiner's statement on September 11, 2020; however, it was backdated to August 28, 2020.

118.    Despite supporting the petition for Powell's recommitment on September 11, Dr. Frazel supported discharge of Powell from HCMC on September 11, 2020.

119.    Dr. Frazel represented, among other things, that Powell had a history "of schizophrenia, polysubstance abuse, trauma who was admitted for SI [suicidal ideations]. He has left multiple placements, is unable to care or self due to his M.I.  Case manager supports recommitment."

120.    Upon information and belief, "M.I." is an acronym for mental illness.

121.    Dr. Frazel opined that she was "of the opinion that [Powell] is in need of treatment and should be committed to a treatment facility."

122.    Dr. Frazel further opined that Powell was in need of neuroleptic medications, and that Powell did not have sufficient awareness of his situation and an understanding of treatment with neuroleptics to make decisions for himself.

123.    While seeking recommitment, the County also sought a *Jarvis* Order, which gives providers the authority to treat patients with antipsychotic medicines without their consent.

124.    In support of the *Jarvis* Order, the County submitted supporting documents signed by Dr. Dornfeld, including a Written Request for Authorization to Impose Treatment and Request for Hearing ("Request") and a Neuroleptic Medication Note for Jarvis Proceedings ("Note").

125.    In the Request, Dr. Dornfeld's representations to the Court included that:

> 7.    Respondent's [Powell] written informed consent to the administration of the above procedure has not been obtained because of incompetency to make a rational decision regarding the proposed treatment.

> 8.    The objective of the proposed treatment is to treat the symptoms of the mental illness that interfere with the respondent's ability to function.

126.    In the Note, which Dr. Dornfeld executed at 10:14 a.m. on September 11, 2020, she opined that the benefits of neuroleptic medication would include "[r]esolution of psychotic symptoms, increased ability to safely live in the community, decreased risk of harm to self/others.  Prognosis if neuroleptic medication is not administered, even if other forms of therapy are utilized, is poor."

127.    Dr. Dornfeld also articulated that Powell's noncompliance with medication was known to Jail staff:

> …Naajikhaan has a history of noncompliance with treatment, has been seen choking up his meds does not adhere to treatment plans…

> …Naajikhaan has been nonadherent with Abililify Maintena in the past and was seen choking up his medications while in jail.  Records indicate that he has a history of noncompliance with treatment…

**F.     With deliberate indifference to his serious medical needs, Powell is housed in general population, alone, subject to only standard 30-minute well-being checks.**

128.    After the deliberately indifferent medical screening by Nurses Angrimson and Leuzzo, and at or around the same time the County was seeking recommitment and *Jarvis* orders for Powell, Powell met with classification officer Dep. Cottom the afternoon of September 11.

129.    Dep. Cottom is responsible for housing inmates according to their mental and/or medical status. In order to determine proper classification, Cottom reviews Jail Manage System (JMS) notes, prior housing, prior behavior notes, SANS, and speaks to the inmate being classified.

130.    Dep. Cottom knew that HCMC had identified Powell as a moderate suicide risk on September 11, and that Powell had been transferred from an HCMC psychiatric unit.

131.    Upon information and belief, Dep. Cottom knew from this detention and Powell's prior detentions that Powell had a history of civil commitment and non-compliance with his neuroleptic medications.

132.    Upon information and belief, Dep. Cottom knew that at or about the same time Powell was being admitted into the Jail, the County was seeking a recommitment and *Jarvis* Order for Powell.  Thus, not only did she know that Powell had serious mental health needs and was a moderate risk of suicide, Dep. Cottom understood that Powell was not presently compliant with his medications.

133.    During his time with Dep. Cottom, Powell acted erratically, objectively indicative of an individual presenting with serious mental health concerns.

134.    Despite all of this information, Dep. Cottom placed Powell in general population subject to only 30-minute well-being checks.

135.    Worse yet, Dep. Cottom placed Powell in a module alone (C-Mod a/k/a Quad 3C), despite knowing from her training and experience that placement in seclusion was likely to increase Powell's risk for self-harm and/or suicide.

136.    In fact, Dep. Cottom effectively placed Powell in a cell with a loaded gun, as she housed him in a cell with a bunk bed, with an easy anchor point, a sheet to use as a ligature, and no one anywhere near Powell to call for help.

**G.    In accordance with its longstanding custom and practice, the Jail deputies failed to properly conduct well-being checks on Powell after he was housed in general population.**

137.    Deputies Scott Johnson ("Dep. Johnson") and Anthony Hamling ("Dep. Hamling").

138.    Dep. Johnson and Dep. Hamling both knew that the Jail has had a severe increase in suicide since 2015.

139.   Dep. Johnson and Dep. Hamling both knew that most, if not all, of the suicides occurring at the Jail since 2015 involved untimely or otherwise improperly performed well-being checks.

140.   Upon information and belief, Dep. Johnson and Dep. Hamling knew that most, if not all, of the suicides at the Jail since 2015 involved detainees with a history of mental illness.

141.   Dep. Johnson and Dep. Hamling both knew that proper well-being checks serve as a deterrent for suicide and other self-harm.

142.   Upon information and belief, Dep. Johnson and Dep. Hamling knew that Powell had a history of serious mental illness from information they learned both on and prior to September 11, 2020.

143.   Upon information and belief, Dep. Johnson and Dep. Hamling knew that Powell just been transferred from HCMC's psychiatric unit on September 11, 2020.

144.   Upon information and belief, Dep. Johnson and Dep. Hamling knew that Powell was being detained for the purposes of the County obtaining recommitment and *Jarvis* Orders.

145.   Upon information and belief, Dep. Johnson and Dep. Hamling knew that given this constellation of circumstances surrounding Powell's detention, Powell was at high risk for suicide and/or other serious self-harm.

146.   Despite all of this information, Dep. Johnson and Dep. Hamling failed to conduct timely or otherwise proper well-being checks on Powell, and misrepresented either the timeliness or adequacy of their supposed well-being checks.

147.    Powell was found hanging in his cell at approximately 5:45 p.m. on

September 11, 2020.

148.    Powell was resuscitated but never regained brain functioning due to his

anoxic injury.

149.    Powell was transported to HCMC.

150.    Powell was removed from life support on September 17, 2020.

151.    Powell's cause of death was anoxic encephalopathy due to

cardiopulmonary arrest (resuscitated) due to ligature hanging.

152.    The HCSO, the County employees, and the Hennepin Healthcare

employees working at the Jail attempted to pass the buck for Powell's suicide.  They

failed to recognize their own failures and pointed the finger solely at Hennepin

Healthcare employees working at HCMC.

153.    In furtherance of this effort, the HCSO obtained search warrants to obtain

Powell's medical records under the articulated probable cause that medical staff at

HCMC may have aided and abetted Powell's suicide at the Jail, stating in the application:

> HCSO is investigating the possible aiding of suicide (Minnesota State
> Statute 609.215.) Your affiant is requesting a search warrant be granted for
> Abbott Northwestern Medical Records of Naajikhan Adonis Powell, DOB
> [96], as this is an ongoing criminal investigation into a suicide and
> information related to Powell's mental health would likely be found in
> Powell's medical records and could have been and likely was accessible to
> doctors at HCMC prior to his release that could have made an impact on
> making decisions on Powell's mental health.

## Count I
## 42 U.S.C. § 1983
## Eighth and/or Fourteenth Amendment Violations
*Plaintiff v. All Individual Capacity Defendants*

154.   Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

155.   Powell suffered from serious medical needs.

156.   The Defendants named in this Count owed Powell a duty to provide for Powell's medical needs, safety, and general welfare.

157.   The Defendants named in this Count knew that Powell had serious medical needs that created a high risk of harm, including suicide, if not properly assessed, addressed, and monitored.

158.   The Defendants named in this Count, under color of state law, acted with deliberate indifference to Powell's serious medical needs in several manners, as detailed herein and as shall be set forth with additional discovery.

159.   Plaintiff alleges in the alternative that each of these Defendants knew that Powell was suffering from these constitutional violations, had a realistic opportunity to intervene to stop these constitutional violations, but failed to intervene either maliciously or with reckless disregard for whether Powell's rights were violated.

160.   As a result, the Defendants named in this Count engaged in conduct that was in violation of the Eighth and/or Fourteenth Amendments to the United States Constitution.

161.    Powell died as a direct and proximate result of the acts and omissions by the Defendants named in this Count.

162.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Powell sustained compensatory and special damages as defined under federal common law and in an amount to be determined by jury.

163.    Punitive damages are available against the Defendants in this Count and are hereby claimed as a matter of federal common law.

164.    Plaintiff is entitled to recovery of his costs, including reasonable attorneys' fees.

165.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota State Statute § 573.02, subd. 1.

166.    As a direct and proximate result of these wrongful acts and omissions, Powell's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

### Count II
**42 U.S.C. § 1983**
**Eighth and/or Fourteenth Amendment Violations (42 U.S.C. § 1983)**
*Plaintiff v. Hennepin County and Hennepin Healthcare*

167.    Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

168.    Hennepin County acted under color of state law, as detailed above.

169. On, prior to, and after September 11, 2020, Hennepin County and Hennepin Healthcare and their final policymakers acted with deliberate indifference to the rights of Powell and others when it tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that failed to provide for the serious medical needs, safety, well-being, and welfare of inmates and/or detainees that presented with serious medical health concerns, including suicidality, at the Jail.

170. On and prior to September 11, 2020, Hennepin County and Hennepin Healthcare had notice of the constitutionally deficient medical care and unconstitutional customs and practices, yet with deliberate indifference to the rights of Powell and others, provided constitutionally deficient medical care to Hennepin County Jail detainees and inmates.

171. Examples of Hennepin County's unconstitutional customs include but are not limited to: failing to train staff to identify inmate's risk for suicidality at the Jail; failing to train staff to conduct proper well-being checks; and failing to discipline staff for failing to conduct proper well-being checks and lying about doing so.

172. Examples of Hennepin Healthcare's unconstitutional customs include but are not limited to failing to train staff to work in a correctional setting and failing to identify an inmate's risk for suicidality at the Jail.

173. The unconstitutional customs and practices were the moving force behind Powell's suicide and the violation of his constitutional rights.

174.    The Defendants named in this Count are subject to liability under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978) and/or *City of Canton v. Harris*, 489 U.S. 378 (1989).

175.    Powell's death was the direct and proximate result of acts and omissions by the Defendants named in this Count.

176.    As a direct and proximate result of the acts and omissions by the Defendants named in this Count, Powell sustained compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

177.    Plaintiff is entitled to recovery of her costs, including reasonable attorneys' fees.

178.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute § 573.02, subd. 1.

179.    As a direct and proximate result of these wrongful acts and omissions, Powell's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Count III**
**Ordinary and Professional Negligence**
*Plaintiff v. Hennepin County and Hennepin Healthcare*

180.    Plaintiff incorporates all allegations in this Complaint as if fully stated herein.

181.    The individual defendants and other employees of Hennepin Healthcare and Hennepin County owed Powell a duty to provide for Powell's well-being and safety.

29

182.    The Defendants named in this Count knew or should have known that Powell was at a high risk of suicide, given his prior medical history and current medical condition.

183.    The individual defendants and other employees of Hennepin Healthcare and Hennepin County deviated from the requisite ordinary and professional standards of care with respect to Powell, as detailed herein and as shall be set forth with additional discovery.

184.    Some of these individual defendants, including Nurses Angrimson and Leuzzo, are classified as health care providers under Minnesota law.

185.    Plaintiff has supplied a declaration of expert review pursuant to Minnesota Statute § 145.682, subd. 4, attached to the initial Complaint as Exhibit B.

186.    Hennepin County and Hennepin Healthcare are directly liable for their operational failures as set forth herein.

187.    Hennepin County and Hennepin Healthcare are vicariously liable for the individual acts and omissions identified herein, including the breach of ministerial duties, as those individuals were acting within the course and scope of their duties as Hennepin County and/or Hennepin Healthcare employees.

188.    The Hennepin County and Hennepin Healthcare employees failed numerous ministerial duties, including: (a) failing to maintain Powell on the minimum required 30-minute welfare check, (b) failing to put Powell on a more frequent mental health check, (c) failing to maintain Powell in a cell where he was appropriately

monitored for suicidality, and (d) failing to understand his suicidality prior to putting him in a cell.

189.    The conduct described in all of the preceding paragraphs amount to wrongful acts and omissions for purposes of Minnesota Statute § 573.02, subd. 1.

190.    These wrongful act and omissions directly and proximately caused Powell's death.

191.    As a direct and proximate result of these wrongful acts and omissions, Powell's next of kin have suffered pecuniary loss, including medical and funeral expenses, loss of aid, counsel, guidance, advice, assistance, protection, and support in an amount to be determined by jury.

**Plaintiff demands a trial by jury for issues of fact herein.**

## Prayer for Relief

WHEREFORE, Plaintiff Tybetha Will Prosper, as Trustee for the next of kin of Naajikhan Adonis Powell, prays for judgment against Defendants as follows:

1.    As to Count I, a money judgment against the individual defendants in excess of Five Million Dollars ($5,000,000) for compensatory, special, and punitive damages in an amount to be determined by a jury, together with costs and disbursements, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition to compensatory damages for the next of kin in an amount to be determined by a jury.

2.    As to Count II, a money judgment against Hennepin County and Hennepin Healthcare in excess of Five Million Dollars ($5,000,000) for compensatory and special

damages in an amount to be determined together with costs and disbursements, including

reasonable attorneys' fees, under 42 U.S.C. § 1988 and prejudgment interest, in addition

to compensatory damages for the next of kin in an amount to be determined by jury.

3.      As to Count III, a money judgment against Hennepin County and Hennepin

Healthcare in excess of Five Million Dollars ($5,000,000) for compensatory damages for

the next of kin in an amount to be determined by jury, in addition to costs, disbursements,

and prejudgment interest.

4.      For such other and further relief as this Court deems just and equitable.


**Dated: May 26, 2021**

| **CONARD NELSON SCHAFFER PLLC** | **NEWMARK STORMS DWORAK LLC** |
|---|---|
| /s/ Kaarin Nelson Schaffer | /s/ Jeffrey S. Storms |
| Kaarin Nelson Schaffer (#0386919) | Jeffrey S. Storms (#0387240) |
| John C. Conard (#0386618) | Paul C. Dworak (#0391070) |
| 121 South 8th St., Ste. 1425 | 150 South 5th St., Ste. 1850 |
| Minneapolis, MN 55402 | Minneapolis, MN 55402 |
| P. 612.808.9827 | P. 612.455.7055 |
| kaarin@conardnelson.com | F. 612.455.7051 |
| john@conardnelson.com | jeff@newmarkstorms.com |
|  | paul@newmarkstorms.com |